# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs December 4, 2012

## STATE OF TENNESSEE v. MICHAEL JOHN STITTS

**Appeal from the Circuit Court for Madison County**
**No. 11-58    Roy B. Morgan, Jr., Judge**

---

**No. W2011-02673-CCA-R3-CD  - Filed January 23, 2013**

---

The defendant, Michael John Stitts, was convicted by a Madison County Circuit Court jury of theft of property over $1000, a Class D felony, and sentenced to six years as a Range II offender in the Tennessee Department of Correction.  On appeal, he challenges the sufficiency of the convicting evidence and the sentence imposed by the trial court.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and JEFFREY S. BIVINS, JJ., joined.

Angela J. Hopson, Jackson, Tennessee, for the appellant, Michael John Stitts.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and Rolf G. S. Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the defendant's selling a 1999 Ford Taurus, owned by Lola Ohonba, to a salvage yard without Ohonba's permission.

**State's Proof**

Charles[1] Ohonba testified that his wife, Lola's, car broke down when he was driving home to Jackson from Memphis. A mechanic from AutoZone looked at the vehicle and determined that it needed a new motor and recommended the defendant to install it. The defendant stopped by the Ohonbas' house, examined the car, and agreed that it needed a new motor. The defendant told Charles that he would do the job for $625 and that the car would be ready in three days.

Because Charles needed the car right away, he gave the defendant $300 to begin work on the car. The defendant had the car towed from the Ohonbas' residence, but Charles did not know to where the car was towed. Charles met with the defendant the following week, but the defendant told him that the car was not ready and that he needed the remaining $325 to complete the work. The defendant collected the $325 from Charles early the following month. Thereafter, every time Charles contacted the defendant to check on the status of his car, the defendant gave him a number of excuses as to why the car was not ready.

Charles said that the defendant never told him that he was going to sell the car to a salvage yard, and he never consented for the defendant to do so. The defendant did not return the money Charles paid to have the car repaired or give him any of the money from the sale of the car. He said that he did not sell the car to the defendant. He recalled that the defendant came over to his house two times, both times to get money from Charles, and Lola was present when he paid the defendant $325. Charles stated that he eventually called the police and learned from an investigator that the defendant had sold his car to a salvage yard.

Two receipts were admitted as exhibits at trial. On the first, the defendant handwrote, "Full amount $625.00. Charles Ohonba paid $300.00 down on getting a motor install[ed] in his 1999 Ford Taurus station wagon. He owe[s] a balance of $325.00 to [the defendant]." The receipt was dated July 13, 2010. The second receipt indicates that Charles paid the defendant $325 "for his engine & parts" on August 14, 2010.

Lola Ohonba testified that she met the defendant when he came to her and Charles' home to collect the balance owed for repairing her car. The defendant had already taken the car after the first payment. Lola said that she was the lawful owner of the 1999 Ford and produced a certificate of title reflecting her ownership. She recalled that she purchased the vehicle in 2008 for $12,000. She said that she did not sell her car to the defendant or consent to him taking the car to the salvage yard. The defendant did not return her car or the money that was paid to repair it, or give her the money he received from selling the car to the salvage yard.

---

[1] Because two of the witnesses have the same surname, we will refer to them by first name for clarity. We mean no disrespect by this practice.

Officer Lucille Ellen Williams with the Jackson Police Department testified that the Ohonbas contacted the police on August 28, 2010, regarding a possible theft. She took a suspicious situation report, but no charges were brought because it was not known at the time that the car had been sold to a salvage yard.

Elaine Robbins, office manager at Hutcherson Metals, identified several documents showing that the defendant sold them a 1999 Ford Taurus. The first document was the weigh ticket, which indicated that the defendant brought in a car, as well as the gross, tare, and net weight. The ticket also included the defendant's signature, phone number, and right thumbprint. The ticket showed that Hutcherson purchased the vehicle for $384.80. The second document was a motor vehicle bill of sale the defendant submitted to Hutcherson, affirming that he was the legal and lawful owner of the vehicle – a 1999 Ford and its vehicle identification number ("VIN").

The third document was the yard ticket, which was completed by the guard. The ticket showed, among other things, the make and VIN number of the vehicle, the tag number, and the date and time the transaction occurred – October 20 at 1:45. It also contained a signature line where the defendant indicated that he was the lawful owner of the materials being sold. The fourth document was a copy of the check issued to the defendant in the amount of $384.80, bearing the defendant's thumbprint. The fifth document was a copy of the defendant's Tennessee identification card.

Robbins testified that she was subsequently contacted by the Jackson Police Department regarding a possible stolen vehicle and was provided with a VIN number. Robbins used that VIN number to locate the ticket and pull up the defendant's information. She said that the defendant represented himself to be the lawful owner of the car.

Investigator Steve Pope with the Jackson Police Department was assigned to investigate the suspicious situation report involving the Ohonbas' vehicle. After talking to Charles, he began searching for the car in the scrap yards, "the first and most obvious place[.]" He contacted Hutcherson Metals, where a match was located to the VIN number on the Ford belonging to Lola and a vehicle sold for scrap by the defendant. Robbins provided him with the supporting documents demonstrating that the defendant had sold Lola's car to Hutcherson for scrap metal.

Investigator Pope said that the VIN number on the motor vehicle bill of sale and the yard ticket provided by Robbins matched the VIN number on the certificate of title provided by Lola. In addition, the fingerprint on the scanned check matched the defendant's

fingerprints.[2]  Investigator Pope stated that, given the totality of the circumstances, it was his opinion that the defendant's "intent from the beginning was to permanently deprive the Ohonbas of the vehicle."  He uncovered no evidence in the course of his investigation that the Ohonbas transferred title of their vehicle to the defendant.

## Defendant's Proof

Gerald Taylor testified that he did "mechanic work" for the defendant and that, in July 2010, he helped the defendant pull the motor out of a 1999 Ford Taurus.  Taylor admitted that he did not help the defendant try to fix the motor, or see the defendant try to fix the motor or the car.

The defendant testified that he met the Ohonbas in July 2010 when he assessed their car for repairs, determining that it needed a new motor.  He denied telling Charles that he would have the car repaired in three days.  He said that Charles paid him $300 to remove the engine and cover the "wrecker fee," but that he had to wait for Charles to pay the balance of $325 before he could buy the new engine.  After receiving the $325, he began looking for the replacement motor.

The defendant testified that, sometime in October, Charles became frustrated that the defendant had not yet found a replacement engine and asked the defendant to sell the car to a salvage yard.  Charles told the defendant that he would use the money from salvage and money paid to the defendant for the repair to buy another car.  The defendant subsequently went to the courthouse, picked up a bill of sale, and signed it because Charles had given him permission to sell the car as scrap.  After selling the car to Hutcherson, the defendant called Charles to inform him that the car had been sold but was unable to reach him.  The next time the defendant heard from Charles was through the police.

The defendant agreed that the money Charles paid for the repair, as well as the money from the sale to the salvage yard, should be given to Charles.  The defendant identified the documents from Hutcherson regarding the sale of the Ohonbas' vehicle.  He claimed that his fiancée, Mary Ann Greer, was present when Charles gave him permission to sell the car.  The defendant maintained that his intention was to fix the car until Charles asked him "to salvage the car for him[.]"

The defendant acknowledged that he had prior felony convictions for assault and evading arrest but said that he had never stolen anything. On cross-examination, he admitted that he was convicted of aggravated assault on July 30, 2001, and sentenced to nine years;

---

[2] The defendant stipulated that his fingerprints were on the documents from Hutcherson.

-4-

he pled guilty to two counts of aggravated assault on October 15, 1992, and was sentenced to six years; and he pled guilty to reckless endangerment on October 15, 1992, and was sentenced to two years.

The defendant examined the two handwritten receipts given to Charles and acknowledged that he wrote the terms of agreement. He also acknowledged that there was no documentary proof that the Ohonbas transferred title of the car to him. He admitted that he was not the lawful owner of the Ohonbas' vehicle, even though he represented himself as such to Hutcherson.

Mary Ann Greer, the defendant's live-in girlfriend, testified that she was not physically present when Charles and the defendant talked about scrapping the vehicle, although she heard the defendant's side of the telephone conversation.

Following the conclusion of the proof, the jury found the defendant guilty of theft of property valued between $1,000 and $10,000.

## ANALYSIS

On appeal, the defendant challenges the sufficiency of the convicting evidence and the sentence imposed by the trial court.

### I. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to support his conviction because he sold the car to the salvage yard at the owner's request. He claims that "it is evident that [he] took possession of the vehicle with the permission of the owners. It is also clear that [his] only intention was to follow the wishes of Charles Oh[o]nba. . . . [H]e would have fixed the vehicle if Oh[o]nba had not requested him to scrap the vehicle." The defendant also argues that there was no proof establishing the value of the car to support the jury's finding that it "was worth more than one thousand dollars."

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600,

604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To sustain the theft conviction in this case, the State had to prove beyond a reasonable doubt that the defendant, with the intent to deprive the owner of property, knowingly obtained or exercised control over property without the owner's effective consent and that the value of the property was between $1000 and $10,000. Tenn. Code Ann. §§ 39-14-103, -105(a)(3) (Supp. 2012). Tennessee Code Annotated section 39-11-106 defines "value" as "(i) [t]he fair market value of the property or service at the time and place of the offense; or (ii) [i]f the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense[.]" Id. § 39-11-106(a)(36)(A). If the value of the property cannot be ascertained by the aforementioned criteria, the property is deemed to have a value of less than fifty dollars. Id. § 39-11-106(a)(36)(C). The fair market value of property is a question of fact for the jury. See State v. Hamm, 611 S.W.2d 826, 828-29 (Tenn. 1981). "The market value of the article stolen, and not its original cost, is the true criterion when it is necessary to establish the value of the property in order to fix the grade of the offense[.]" Id. at 829 (internal citations omitted).

In the light most favorable to the State, the evidence shows that the Ohonbas paid the defendant $625 to install a new motor in their car, but the defendant took the car and sold it to a salvage yard. Lola and Charles both testified that neither of them sold the family car to the defendant or consented to the defendant's selling the car to the salvage yard. The

defendant did not return the money the Ohonbas paid to have the motor repaired or give them the proceeds from the sale of the car. The defendant even admitted in his testimony at trial that he was not the legal and lawful owner of Lola's car when he sold it to the salvage yard. Any testimony from the defendant that he only sold the car to the salvage yard per the owners' request was rejected by the jury as the trier of fact, as was its province. Moreover, the jury determined that the value of the car was more than $1,000 but less than $10,000, based on Lola's testimony that she purchased the 1999 vehicle in 2008 for $12,000. The jury used its common sense in making its determination regarding value given the purchase price and elapsed time. See State v. Steven Bernard Sydnor, No. M2007-02393-CCA-R3-CD, 2010 WL 366670, at *20 (Tenn. Crim. App. Feb. 2, 2010), perm. app. denied (Tenn. June 17, 2010); State v. Jeremy Grooms, No. 03C01-9409-CR-00321, 1995 WL 238606, at *2 (Tenn. Crim. App. Apr. 25, 1995), perm. app. denied (Tenn. Aug. 28, 1995).

## II. Sentencing

The trial court conducted a sentencing hearing at which the defendant testified that he was self-employed as an auto mechanic. He was also seeking disability due to a back injury. He asked the court to grant him probation and said that he would pay restitution and all of his fines. Mary Ann Greer, the defendant's girlfriend, testified that she and the defendant live together and that he is her main financial provider. She asked that the court be lenient on the defendant and give him probation.

The defendant's presentence report was introduced as an exhibit at the hearing. The report revealed that the defendant had three prior felony aggravated assault convictions, as well as a felony reckless endangerment conviction. He also had a number of prior misdemeanor convictions, including convictions for assault, vandalism, evading arrest, criminal trespass, driving offenses, and escape from jail.

The trial court determined that the appropriate sentence was six years in the Department of Correction, which the defendant now challenges. He asserts that he should have received the minimum sentence of four years and been granted full probation or a split sentence.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Id. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the

public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

In determining the defendant's sentence in this case, the court considered the enhancement and mitigating factors and found that the defendant had a previous history of criminal behavior in addition to that necessary to establish his range. See Tenn. Code Ann. § 40-35-114(1). The court observed that the fact the defendant's criminal conduct neither caused nor threatened serious bodily injury, see id. § 40-35-113(1), "certainly could apply" in mitigation but that the court "in no way could conceive" how the other mitigating factors argued by the defendant could apply. The court concluded that, "[c]onsidering the circumstances and the range in this case, I do find that a 6-year sentence would be appropriate." With regard to the manner of service of the sentence, the court determined:

> The Defendant will be ordered to serve his sentence in [the] Tennessee Department of Correction[] considering the facts in this case. I recall the facts of the case and the extensive record that has been outlined, and the Court feels

it appropriate that he serve this sentence. It will not be suspended. He will not be placed on probation. He will be ordered to serve it in [the] TDOC."

We discern no abuse of discretion in the length of sentence imposed by the trial court. The six-year sentence was within the applicable range of punishment and was supported by the defendant's lengthy criminal record as detailed in the presentence report. As to the trial court's imposition of a sentence of confinement, the record shows that the thirty-eight-year-old defendant has consistently engaged in criminal conduct since the age of seventeen. Moreover, he failed to accept responsibility for his actions, which reflects poorly on his potential for rehabilitation and is a basis for the denial of probation. See State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996). The trial court appropriately considered the above sentencing principles as well as all the relevant facts and circumstances. We discern no error in the trial court's sentencing determinations and, accordingly, affirm the trial court's denial of probation or other alternative sentencing.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE